## THE FULTON.
### No. 82.

Circuit Court of Appeals, Second Circuit.
Dec. 7, 1931.

John E. Morrissey, of New York City, for appellant.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson, of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The libellant sued for damages resulting from a collision between its car float in tow of its tug "Arbuckle," and a car float in tow of the claimant's tug "Fulton" on the Brooklyn side of the East River about opposite the Fulton Ferry. The "Arbuckle" was bound up stream, with the car float on her starboard hand; the "Fulton," down stream, her car float also to starboard. As the "Arbuckle" approached the Brooklyn terminal of the Fulton Ferry, a ferryboat came out going to New York. The "Arbuckle," though the burdened vessel, blew two blasts and the ferry consented and stopped her way to let the tow cross her bows. Upon much controverted evidence the judge found as follows: The "Fulton," which had meanwhile been coming down, also blew two blasts to the ferry, surrendering her privilege, to which the ferry agreed. She thought it best being at full speed, to make a starboard passing with the "Arbuckle," although each was then on the other's port hand. Accordingly she blew a double blast which, upon getting no answer, she repeated, and which the "Arbuckle" then crossed with a single blast. The "Fulton" thereupon starboarded, crossing the "Arbuckle's" bows to go under the ferry's stern. The "Arbuckle" kept on without change of helm, until, collision becoming imminent, both reversed in extremis; but too late, for the bows of the two floats came together. The judge held the "Fulton" at fault because as between her and the "Arbuckle" the situation was one for a port passing, and she crossed the "Arbuckle's" bows at high speed. He exonerated the "Arbuckle" in spite of her cross signal, finding that she did not, as the "Fulton" insisted, starboard to let the ferry pass under her stern.

The case is of the familiar kind in which it is necessary to restore out of the mouths of witnesses a fleeting situation of danger, irrecoverable because of the excitement at the moment, the inevitable bias of many of the narrators, and the lapse of time, in this instance very great. We have so repeatedly said that we would not substitute our judgment, drawn from print alone, that it is not necessary to do more than allude to this doctrine. We accept the judge's conclusion that the "Fulton" was further out from the Brooklyn shore than the "Arbuckle"; so far as we can see, his finding that the "Arbuckle" "favored" that shore was if anything too

conservative. The "Fulton" was certainly in midstream, and the situation was apt for a port passing. If the "Fulton" did not wish to cross the ferry's bows, she could have waited, backing meanwhile; for while this would have thrown her somewhat athwart the stream, it was better than to cross the "Arbuckle's" bows. Again, the judge has discredited the story of the "Arbuckle's" starboard helm; we see no reason to say that he should have accepted it. The "Arbuckle," having the ferry's assent, came straight on; the "Fulton" tried to force upon her a starboard passing, contrary to law, and she was clearly at fault.

The "Arbuckle's" fault depends only upon her cross signal and her failure at once to sound the alarm and back. The Inspectors' Rules have always forbidden cross signals in passing situations, and in all others too since 1909. They have coupled the injunction with another which required the answering vessel, if the first signal was inappropriate, to sound an alarm and check her speed, now apparently confined to crossing situations (Rule VII). In a number of decisions involving crossing situations we have exonerated a vessel which pressed her statutory privilege by crossing the signal and holding her course and speed. The John King (C. C. A.) 49 F. 469; The Cygnus (C. C. A.) 142 F. 85; The Transfer No. 15 (C. C. A.) 145 F. 503; The John H. Starin (C. C. A.) 162 F. 146; The Montauk (C. C. A.) 180 F. 697; The Ashley (C. C. A.) 221 F. 423. Our reasoning has been, that, as the statute (Inland Rules) article 21 (33 USCA § 206), puts a duty upon the privileged ship to keep her course and speed, no rule can be valid which affects to relieve her of it, and that she may announce her determination to insist by crossing the first signal. The doctrine has been too long and too repeatedly established to allow any question now, but it is plain that the inspectors have never assented to it. We have at times said that the rule promoted collisions, which were to be avoided only by rigid adherence to the statutory rules. The supposed certainty is, however, somewhat illusory, for concededly there comes a time when the privileged vessel must yield; there is never a "right of way into collision." At best the point where she must do so, is one of degree, and, were the question res integra, we should hold the rule valid. The inspectors apparently believe that in the greater number of cases it will conduce to collision to allow a pilot to keep on in the face of a proposal by the approaching vessel that she put herself across his bows. True, the proposer often will not act without consent; but it is certainly possible that prudence forbids speculation as to whether he has still time or disposition to keep out of the way. Again and again cases arise in which the proposal is repeated, the vessels coming nearer all the time; sometimes it is repeated even after it has been crossed by a refusal. No substantial interest is at stake except to escape collision which will certainly be avoided if both stop. We recognize that the requirement puts a premium upon wilfulness, for the burdened vessel need only announce her purpose and keep on; and if the other prove docile, she has lost her right of way and must bear the insolence. This may perhaps prove too much for ordinary human nature, but "safety is better than pride"; [The Quogue, 47 F.(2d) 873 (C. C. A. 2)], and stopping is more likely to avoid disaster than going on in the teeth of what is at least a proposal, and may be a declaration. At any rate the situation appears to us proper for the exercise of the inspectors' function in providing for cases not covered explicitly. They are certainly in better position than we to determine which course is safer in the long run.

The court as now constituted cannot see any conflict with the statute, unless that be read without regard to its purpose. Articles nineteen and twenty-one (33 USCA §§ 204, 206) do not require any signals at all; if one is given proposing a dangerous course, it appears to us too verbal and rigid an interpretation to say that the privileged vessel is inevitably still bound; at least officials, vested with general authority, are not helpless to meet the situation by a rule. All the steaming rules are themselves subject to Article twenty-seven (33 USCA § 212) authorizing a departure "to avoid immediate danger." Can it be that though vessels themselves may so depart, the inspectors may not say that a situation likely to be dangerous shall be treated as such? However, unless the Supreme Court chooses finally to settle the whole matter otherwise, in crossing situations we have no option and shall continue to disregard the rule, whatever our personal judgment. But in head-on situations we are not committed, and there are good reasons for a distinction. It is true that in The Terminal (C. C. A.) 4 F.(2d) 1022, a head-on situation, we affirmed Judge Campbell without opinion, who had held the rule invalid. (D. C.) 290 F. 533. It does not follow, however, that we thought it necessary to pass upon that point,

and in The Quogue (C. C. A.) 47 F.(2d) 873, we condemned a vessel in a head-on case for crossing signals and insisting upon her rights. We do not think that the rule by any stretch can be thought to violate article 18, rule 1, of the statute (33 USCA § 203, rule 1). That begins by providing in general that the vessels shall pass port to port, and then proceeds: "either vessel shall give * * * one short * * * blast * * * which the other vessel shall answer promptly by a similar blast * * * and thereupon such vessels shall pass on the port side of each other." The same language is repeated for starboard passings, mutatis mutandis. It is plain that the answering vessel's duty to give a single blast arises only when she has received a single blast; also that the helms are to be ported, if at all, where signals are exchanged. If she receives a double blast the condition has not arisen on which her duty depends; she is bound neither to blow one blast, nor to port. We can see no possible ground in such a case for declaring the rule invalid, and possibly it was originally so limited for that reason. Moreover, if she is not to answer with a single blast or port her helm, the case falls within article 27 (33 USCA § 212), and she must avoid the danger, which can best be done by stopping and sounding an alarm. The Quogue, supra. To insist upon a port passing under such circumstance appears to us to invite collision.

Therefore, we hold the "Arbuckle" at fault for crossing the signal. It does not appear that she ported, and there was no reason why she should, as the situation was already safely port to port; but she should at once have sounded the alarm and stopped her way. What would have been the effect of this is of course uncertain, but it rests upon her to show beyond a doubt that it could not have avoided the collision. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148. The judge in his first opinion thought that she had failed in meeting this severe demand, and changed his decision only because he supposed it lawful to cross the signal. We see no reason to differ with him on the facts, and we hold the "Arbuckle" also liable.

There has been an extraordinary delay. The libel was filed more than four years after the collision, which occurred nearly ten years ago. In spite of the absence of any explanation, we cannot see that the delay ipso facto should defeat the claim. Although one of the claimant's witnesses died before trial, this was misfortune whose consequences cannot be pressed so far. The decree gives interest only from its date as we understand it; this is all the penalty we can impose.

Decree modified by dividing the damages.