# THE EASTERN GLADE.

## THE EL ISLEO.

### POSTAL S. S. CORPORATION v. SOUTHERN PAC. CO.

### SOUTHERN PAC. CO. v. POSTAL S. S. CORPORATION.

District Court, S. D. New York.

Aug. 30, 1937.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Burton H. White, both of New York City, of counsel), for Southern Pac. Co. and the El Isleo.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for Postal S. S. Corporation and the Eastern Glade.

MANDELBAUM, District Judge.

The steamships Eastern Glade and El Isleo collided near the junction of Curtis Bay and Fort McHenry Channel in the approach to Baltimore Harbor on December 19, 1935, at about 5:40 p. m.

Cross-libels were filed on behalf of each vessel which in effect charge each other with some faulty act of navigation resulting in the collision.

The Eastern Glade was headed eastward through the Curtis Bay Channel bound for the Standard Oil Fuel Docks at Canton, in Baltimore Harbor. The El Isleo was proceeding in a northerly direction up the Fort McHenry Channel bound for the inner harbor of Baltimore.

From the depositions taken, as well as from the testimony of Captain Korn (master of the El Isleo, who was the only witness who testified at the trial), it appears that as the El Isleo was proceeding up Fort McHenry Channel and when about abreast of Fort Carroll, the green (right) side light of the Eastern Glade was sighted about two miles away on the port (left) bow. Those on the Eastern Glade observed the El Isleo's red (left) side light.

The El Isleo contends that the respective positions of the vessels created what is termed a "crossing situation" in which El Isleo's course crossed the Eastern Glade course from right to left, and Eastern Glade's course crossed El Isleo's course from left to right.

The Eastern Glade, on the other hand, urges upon the court that the situation created by the relative positions of the vessels was not a "crossing situation," but rather one of special circumstances, making inapplicable the "Starboard Hand Rule" which governs crossing situations.

In a "crossing situation" the following provisions of the Inland Rules of Navigation apply:

Article 19: "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." 33 U.S.C.A. § 204.

Article 22: "Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other." 33 U.S.C.A. § 207.

In a situation involving special circumstances, article 27 of the Inland Rules of Navigation applies. This provides as follows: "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." 33 U.S.C.A. § 212.

The Eastern Glade urges that since both vessels were not proceeding in the same channel (Eastern Glade in Curtis Bay Channel and El Isleo in Fort McHenry Channel), the "Starboard Hand Rule" does not apply. Articles 17 and 22, Inland Rules of Navigation (33 U.S.C.A. §§ 202, 207).

■ Very little discussion is necessary on this point. It is the court's finding that irrespective of whether each vessel found itself in a different channel while approaching each other, this was a "crossing situation" calling for the application of the "Starboard Hand Rule." So, that, under this rule, the El Isleo was the *privileged vessel* and the Eastern Glade the *burdened one.*

With this in mind, let us see what transpired after the vessels sighted each other. It is undisputed that the Eastern Glade sounded a two-blast signal whistle. This indicated an intention to cross the El Isleo's bow. It is important, at this point, to quote from some of the testimony of the Eastern Glade's master, taken by deposition, regarding the meaning of the two-blast signal.

"Q. Oh, it wasn't a passing signal? A. It was two blasts to show the way I was directing my course.

"Q. *Are you thinking of the International Rules?* A. Yes.

"Q. In the Inland Rules, where vessels are on crossing courses and the vessel having the other on her starboard bow sounds two blasts, what does it mean? A. On her own starboard bow?

"Q. Yes. A. Am I being examined now by the Steamboat inspector?

"Mr. Farwell: Answer the question if you can. A. It means you are going to cross his bow."

Deposition of A. T. Hudgins, p. 201. (Emphasis by the court.)

Evidently from the foregoing, it would appear that the Eastern Glade's master was navigating under the International Rules, which apply to ocean and foreign waters, rather than Inland Rules. Under article 28 of the International Rules (33 U.S.C.A. § 113), two short blasts mean, "I am directing my course to port." This is not the same as a two-blast signal under the Inland Rules, where such signal means, "I am going to cross your bow."

After the two-blast signal, the El Isleo responded with a danger signal (four blasts), followed immediately by a one-blast signal. The four blasts indicated that it was dangerous for the Eastern Glade to proceed as intended by her two-blast signal. The one-blast signal following immediately indicated that the El Isleo *intended to continue on up the channel.* The master and third mate of the El Isleo say that they heard a reply from the Eastern Glade of four blasts followed by one. The one-blast signal is denied by the Eastern Glade, whose witnesses say that in answer to the El Isleo's five-blast alarm, the Eastern Glade sounded a signal of three blasts, indicating a "backing" signal.

Another glimpse at a portion of the deposition taken of the master of the Eastern Glade helps the court in placing the blame, where the court believes it rightfully belongs. The master testified that he never intended to come out of Curtis Bay at the time El Isleo was passing, and that the whole trouble was due to a miscalculation on his part because of darkness. His testimony, under cross-examination is as follows:

"Q. Well, according to your calculations, El Isleo would have gotten up to 7 M. before you got out of the channel, and there would be no trouble at all? A. That is what I expected.

"Q. But it turned out that you got up there at about the same time he did? A. Yes.

"Q. So either you must have slowed and stopped your engine or else your speed must have been greater than you thought it was? A. No.

"Q. Then what do you think upset your calculations? A. Darkness.

"Q. *It was just a miscalculation?* A. *Miscalculation.*

"Q. *But you had no intention of doing anything except holding back and letting him go on up the channel and fall in astern of him and you go up?* A. *Right.*

"Q. *At any time did you have any intention of doing otherwise?* A. *No.*"

Deposition of A. T. Hudgins, pp. 199, 200. (Emphasis by the court.)

Under the rules of the road, the El Isleo had a right to proceed in the manner that she did, and it was incumbent upon the Eastern Glade to keep out of the way of the El Isleo. She should have remained in Curtis Bay Channel until El Isleo passed. The reason for her emergence into Fort McHenry Channel is immaterial. Be it due to miscalculation of her master, darkness, or bad handling, her failure to remain in Curtis Bay after a five-blast signal of the El Isleo constituted a violation on her part of the Rules of the Road.

■ The Eastern Glade argues that the master of the El Isleo was at fault in swinging his vessel to starboard out of the channel, instead of stopping and reversing when collision became imminent. In answer to this, it may be said that there is no rule of law which requires a master to invariably stop and reverse his vessel in the presence of danger. The conduct of the master is governed by the circumstances of each particular case.

The Eastern Glade had violated the rules of the road by immerging into Fort McHenry Channel. So that even conceding that the collision could have been avoided if he (Captain Korn) had reversed the El Isleo, the blame does not shift to him *if he acted prudently.* At bar, the El Isleo was confronted with two alternatives to avoid the collision, namely, to stop and reverse, or to swing to starboard out of the channel. The latter alternative was chosen. The course taken appears to have been the prudent one when considering the momentum given to her by her speed and cargo. Her master had reason to believe that by increasing her speed while swinging to starboard, he would get away from the Eastern Glade and reduce the risk of collision. When the master realized that he could not avoid what eventually happened, he stopped the engines.

The court finds that the course pursued by Captain Korn was neither prompted by a stubborn adherence to a general rule, nor pride in not giving up his right of way, so to speak, even if he had to crash to assert it. The course pursued by him is better described as being prompted by the exigencies of the occasion. See the Mary T. Tracy (D.C.) 298 F. 528, 530; reversed on other grounds (C.C.A.) 8 F.(2d) 591, 593.

■ Finally, the Eastern Glade resorts to Revised Statutes, § 4401 (46 U.S.C.A. § 364), to impose liability on the El Isleo. That section provides: "every coastwise seagoing steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats."

It appears that Captain Korn, master of the El Isleo, had no pilot's license for Baltimore Harbor. It is therefore the contention that the El Isleo is presumptively at fault because at the time of collision she was in actual violation of a statute to avoid collisions.

Was it Captain Korn's ignorance of Baltimore Harbor that contributed to the collision? The answer, I believe, should be in the negative. Captain Korn testified to holding a master's license for 30 years and being at sea for about 48 years. Assuming, without deciding, that his failure to hold a pilot's license for Baltimore Harbor constituted presumptive fault on the part of the El Isleo, the court still thinks that the situation at bar comes within the exception to the rule (if that be the rule). The very cases cited by the Eastern Glade in support of this proposition say that it becomes incumbent upon the offending vessel in order to overcome the presumption of fault that the absence of a licensed master not only did not enter into the occurrence, *but that it could not have done so.*

The court finds that Captain Korn violated no rule of navigation and conducted himself under the circumstances as an experienced seaman should. In this connection, the court cannot help but compare the conceded miscalculations of Captain Hudgins of the Eastern Glade, as well as his apparent confusion with respect to the meaning of a two-signal blast. International Rules and Inland Rules. Captain Korn's lack of a pilot's license had nothing

whatsoever to do with the occurrence. The fault lies with the Eastern Glade in not having heeded the El Isleo's five-blast signal and remained in Curtis Bay Channel so as to permit the privileged vessel to pass.

The failure of the court to discuss various other propositions offered by both sides in support of their respective positions is not because they are deemed unimportant or irrelevant to the issues. To discuss them at length would unnecessarily prolong the opinion and serve no useful purpose. All the facts and circumstances in the case, together with what has been discussed above, leads the court to place the blame for the collision on the Eastern Glade and to exonerate the El Isleo from any fault.

In accordance with those views, the court directs a decree dismissing the libel of Postal Steamship Corporation v. El Isleo and allowing a decree to enter against Postal Steamship Corporation in favor of Southern Pacific Company for damages sustained by the El Isleo.