308 U.S. 378 (1940)
POSTAL STEAMSHIP CORP.
v.
EL ISLEO.[*]
No. 73.
Supreme Court of United States.
Argued December 12, 1939.
Decided January 2, 1940.
CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.
*379 Mr. John Co. Crawley, with whom Mr. Earle Farwell was on the brief, for petitioner.
Mr. Chauncey I. Clark, with whom Mr. Burton H. White was on the brief, for respondent.
MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.
The steamer Eastern Glade, owned by petitioner, collided with the steamer El Isleo, owned by respondent, in the waters of Baltimore harbor. Each owner filed a libel against the vessel of the other. The District Court found that the Eastern Glade was solely at fault (20 F. Supp. 373) and decrees dismissing petitioner's suit and awarding damages to respondent were affirmed by the Circuit Court of Appeals. 101 F.2d 4. In the view that there was involved an important question of maritime law which had not been, and should be, settled by this Court, certiorari was granted.
The question is said to arise from rulings of the Circuit Court of Appeals with respect to the validity of *380 Rules II and VII of the Board of Supervising Inspectors[1] in the light of the applicable provisions of the Act of Congress.[2] See The Fulton, 54 F.2d 467, 468.
The facts are thus stated by the Circuit Court of Appeals:
"The collision occurred in the waters of Baltimore Harbor near the junction of Curtis Bay Channel with Fort McHenry Channel. The latter is about 600 feet wide and runs in a northwesterly direction towards Baltimore; the former, running nearly east and west, comes into Fort McHenry Channel from the west but does not cross it. The night was clear, the tide ebb, and a 15 mile breeze was blowing from the northwest. The steamship Eastern Glade, light, was bound out of Curtis Bay Channel and was intending to turn left into Fort McHenry Channel and proceed to Baltimore. The Steamer El Isleo, laden with 1,000 tons of steel ore, also bound for Baltimore, was proceeding up Fort McHenry Channel at full speed  about eight miles through the water, as she was working only one boiler. When the vessels sighted each other they were more than a mile apart, the El Isleo being, about four points on the starboard bow of the Eastern Glade. The latter stopped her engines and shortly thereafter sounded a two blast signal to indicate, as her master says, that his course was to the left and up Fort McHenry Channel. El Isleo answered the two blast signal with an alarm followed by one blast to indicate that she would keep her course and speed. Captain Korn of El Isleo testified that the Eastern Glade responded with four blasts followed by one, while her captain says she responded with three blasts to indicate that she was reversing her engines. El Isleo kept on until she reached *381 a buoy just opposite Curtis Bay Channel, when, believing collision imminent, she put her rudder hard right and swung out of Fort McHenry Channel to her starboard. The Eastern Glade, although her master testified that he intended to hold back in Curtis Bay Channel until El Isleo had passed the junction, came clear across Fort McHenry Channel and brought her stem into contact with the port side of El Isleo about amidships. The place of collision was east of Fort McHenry Channel. The district court did not determine how far to the east, but McDonald testified it was about 200 yards."
After referring to the question whether the vessels were on crossing courses as the district court had held, or whether the situation was one of special circumstances, as petitioner contended, the Court of Appeals continued:
"It is not disputed that El Isleo's course up Fort McHenry Channel was always apparent to the Eastern Glade. But the latter's course was not immediately apparent to El Isleo; when the Eastern Glade should reach the end of Curtis Bay Channel, she might turn left, she might turn right, or she might conceivably, though improbably, cross Fort McHenry Channel, since there was water enough to the East of that channel, although neither pier, port nor anchorage to which she might be bound appears on the chart. When, however, she sounded her two blast signal, she indicated an intention either to cross the bows of El Isleo by proceeding across Fort McHenry Channel, or to turn to the left and proceed up that channel. The former alternative would clearly result in crossing courses; the latter would result in converging courses, since the Eastern Glade's course, if projected, would carry her into the starboard lane of Fort McHenry Channel, unless she violated her duty by going up on the wrong side. Such converging, courses involve the very risk that resulted in the collision, and the rights *382 and duties of the vessels are governed by Articles 19, 22 and 23 of the Inland Rules, 33 U.S.C.A., §§ 204, 207, 208. . . . Accordingly, the district court was right in treating the situation as one of crossing courses."
The Articles of the Inland Rules established by Congress[3] provide:
"Art. 19. When two steam-vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other.
"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed.
"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other.
"Art. 23. Every steam-vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed, or stop or reverse."
Applying these statutory provisions, and viewing the situation as one of "crossing courses," the Court of Appeals found that no fault appeared in the navigation of El Isleo, the "Privileged vessel." The fault of the Eastern Glade was found to be glaring and alone sufficient to account for the disaster.
Petitioner does not contest the ruling that the Eastern Glade was at fault but insists that El Isleo was also at fault. Petitioner argues that El Isleo violated Rules II and VII of the Supervising Inspectors, purporting to have been adopted under the authority of the statute.[3] These rules are as follows:[4]
*383 "Rule II. Steam vessels are forbidden to use what has become technically known among pilots as `cross signals,' that is, answering one whistle with two, and answering two whistles with one.
"Rule VII. When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse.
"If from any cause the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."
Petitioner says that these rules are not inconsistent with the statute and have the force of law; that they provide in substance "that where the so-called privileged vessel in a crossing situation receives an unacceptable proposal to cross ahead, the privileged vessel may not maintain her course and speed until collision becomes imminent but must at once sound danger signals and stop and bank if necessary until a safe passage has been agreed upon." Hence, it is argued, that El Isleo was required to "stop, and reverse if necessary," when the Eastern Glade sounded her two-blast signal, and that the only question here is as to the validity of the Inspectors' requirements.
Respondent contends that the statutory provisions of Articles 19-23 govern; that it was not only the privilege *384 but the duty of El Isleo to "keep her course and speed"; that it was not the intention of the Supervising Inspectors to modify that affirmative duty; that El Isleo was not bound to agree to the two-blast signal from the Eastern Glade; that the signals had been made and were understood by each vessel and the collision was due to the miscalculation of the master of the Eastern Glade; and that if there were any errors in El Isleo's navigation they were errors in extremis for which she is not liable.
The Inspectors' prohibition against "cross signals," found in Rule II, was originally applicable to "vessels approaching each other from opposite directions"[5] but was amended so that its terms apply to crossing situations as well.[6]The Fulton, supra. But the Court of Appeals in a number of decisions involving crossing situations has disregarded the Inspectors' rule and has "exonerated a vessel which pressed her statutory privilege by crossing the signal and holding her course and speed."[7]Id. It is unnecessary to review the many cases which the present parties cite, as the court itself has summarized its position:
"Our reasoning has been, that, as the statute (Inland Rules) article 21 (33 U.S.C.A., § 206), puts a duty upon the privileged ship to keep her course and speed, no rule can be valid which affects to relieve her of it, and that she may announce her determination to insist by crossing the first signal. The doctrine has been too long and too repeatedly established to allow any question now, but it is plain that the inspectors have never assented to it." Id.
*385 Although the Court of Appeals, after making this statement in The Fulton, said that, as the court was then constituted, it could not see any necessary inconsistency between the Inspectors' rule and the statute, the court concluded that "unless the Supreme Court chooses finally to settle the whole matter otherwise," it had no option "in crossing situations" and would "continue to disregard the rule." The Fulton, however, presented a "head-on situation," and the Court of Appeals, feeling that it was not committed in such a case, decided that the steamship there in question was "at fault for crossing the signal." Id., p. 469.
In the instant case, the Court of Appeals again referred to the rule as established in the second circuit, "that in a crossing situation the privileged vessel may `cross' the signal of the burdened vessel and hold her course and speed until it becomes evident that the burdened vessel either cannot or will not keep out of the way." And the court observed that although this rule was criticized in The Fulton, it was thought to be "too firmly established to be departed from until the Supreme Court speaks." The court added that it still adhered to that view. 101 F.2d, p. 6.
We may assume that the Supervising Inspectors had no intention to depart from the statute under which they claimed authority to make their regulations. And Articles 19-23 of the statute are to be read in the light of Article 27 which has the following controlling qualification:
"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."
Moreover, the Inspectors expressly recognize and follow the statute in providing in Rule VII, first paragraph, that "the steam vessel which has the other on her own port *386 side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse." The second paragraph of Rule VII, providing for the stoppage and backing of both vessels if necessary "until signals for passing with safety are made and understood," was clearly intended to apply to the dangerous situation envisaged in Article 27 of the statute.
The grounds for criticising the rulings of the Court of Appeals of the second circuit in disregarding the Inspectors' requirement cannot be better stated than in the court's own language in The Fulton. After referring to its former decisions, by which it felt itself bound, the court observed that "concededly there comes a time when the privileged vessel must yield"; that there is never a "right of way into collision"; that the point at best "is one of degree"; and that if the question were res integra the Inspectors' rule would be held valid. The court continued: "The inspectors apparently believe that in the greater number of cases it will conduce to collision to allow a pilot to keep on in the face of a proposal by the approaching vessel that she put herself across his bows. True, the proposer often will not act without consent; but it, is certainly possible that prudence forbids speculation as to whether he has still time or disposition to keep out, of the way. Again and again cases arise in which the proposal is repeated, the vessels coming nearer all the time; sometimes it is repeated even after it has been crossed by a refusal. No substantial interest is at stake except to escape collision which will certainly be avoided if both stop." Stopping "is more likely to avoid disaster than going on in the teeth of what is at least a proposal, and may be a declaration." So, the Court thought that the situation was a proper one "for the exercise of the inspectors' *387 function in providing for cases not covered explicitly." The court could not see "any conflict with the statute, unless that be read without regard to its purpose." For Articles 19 and 21 "do not require any signals at all"; and "if one is given proposing a dangerous course," the court thought it "too verbal and rigid an interpretation to say that the privileged vessel is inevitably still bound; at least officials, vested with general authority, are not helpless to meet the situation by a rule." And after nothing that Article 27 of the statute authorized a departure "to avoid immediate danger," the court posed the question  "Can it be that though vessels themselves may so depart, the inspectors may not say that a situation likely to be dangerous shall be treated as such?"
We are in accord with the criticism thus effectively expressed by the Court of Appeals of its established rule, and we think that the court should be relieved of its assumed obligation to follow its former decisions holding the Inspectors' requirement invalid. We think that Inspectors' Rule II should be read in connection with their Rule VII and that both should be construed in the light of the statutory provision in Article 27.
The plain purpose of the Inspectors' Rules is to minimize the danger of collision. The so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision and in the presence of that danger both vessels must be "stopped and backed if necessary, until signals for passing with safety are made and understood."
In The Quogue, 47 F.2d 873, where the Court of Appeals of the second circuit had before it a "head-on situation," the court condemned a vessel "for crossing signals and insisting upon her rights." That vessel was The Transfer and the right insisted upon was that of port *388 to port passage. The fault of the other vessel, The Quogue, in undertaking to cross the bow of The Transfer was found to be "most glaring," but The Transfer was also held at fault because her master was not justified in acting on the assumption that The Quogue would not carry out the maneuver indicated by her signals unless he consented. He did not "reverse as promptly as he should," for when the dangerous situation was presented "he was not privileged to continue on his course on the chance that the other vessel would change her announced purpose if he refused to consent." The Court of Appeals aptly said: "It is a hard rule which requires a master when he sees another vessel about to cross his bow with wanton disregard of his rights to stop and allow the arrogant usurper to pursue his wrongful course. But safety is better than pride; and however slight the hope that rules to promote safety will be observed under such circumstances, whatever courts may say, the vessels must be judged according to their legal duties."
The Court of Appeals in The Fulton considered these observations in The Quogue to be pertinent, and we think that they are pertinent to a dangerous situation arising in connection with crossing courses. We see no sufficient ground for a distinction in upholding and applying the Inspectors' requirements in such cases.
We deal simply with the question presented with respect to the validity of the Inspectors' rules here in question. We hold these rules are not essentially inconsistent with the statute and are valid, both the statutory provisions and the Inspectors' Rules being designed to promote safety in situations fraught with danger. We do not pass, or intimate any opinion, upon the particular facts of the instant case, as it is the appropriate province of the Court of Appeals to deal with these. As the Court of Appeals apparently did not consider the conduct of El Isleo in the light of the Inspectors' requirements, but *389 thought, under the compulsion of its former decision, that it must disregard those requirements, we think that the cause should be returned to the Court of Appeals to be decided by it, free of that compulsion.
To afford that freedom we reverse the judgments and remand.
Reversed.
NOTES
[*] Page 378 Together with No. 74, Postal Steamship Corp. v. Southern Pacific Co., also on writ of certiorari to the Circuit Court of Appeals for the Second Circuit.
[1] "Pilot Rules for Certain Inland Waters," etc., effective, as amended, May 1, 1912.
[2] Inland Rules, Act of June 7, 1897, Arts. 19, 21-23, 27, 30 Stat. 101, 102; 33 U.S.C. 204, 206-208, 212.
[3] Act of June 7, 1897, c. 4, § 2, 30 Stat. 102; 33 U.S.C. 157.
[4] See Note 1.
[5] See Rule III, "Pilot Rules for Atlantic and Pacific Coast Inland Waters," edition October 23, 1906.
[6] See Rule II, edition July 1, 1907; edition May 1, 1912.
[7] In The Fulton, 54 F.2d, p. 468, the Circuit Court of Appeals cited to this effect The John King, 49 F. 469; The Cygnus, 142 F. 85; The Transfer No. 15, 145 F. 503; The John H. Starin, 162 F. 146; The Montauk, 180 F. 697; The Ashley, 221 F. 423.