[No. 28848. *En Banc.* June 1, 1943.]

THOMAS ELLESTAD *et al., Appellants,* v. GRACE LEONARD, *Respondent.*[1]

[1] Reported in 138 P. (2d) 200.

*Cosgrove, Terhune & Schlosstein,* for appellants.

*Hill, Newman & Cook,* for respondent.

ROBINSON, J.—This is an action for damages to person and car received in an automobile collision in a Seattle street intersection. The defendant denied the plaintiffs' allegations of negligence and pleaded plaintiffs' contributory negligence. The action was tried by the court without a jury. The trial court held that defendant was negligent in not keeping a proper lookout and in not yielding the right of way; that the Ellestad car had been damaged in the amount of five hundred dollars, and that Mrs. Ellestad's damage would be about fifty dollars, but that the plaintiffs could not recover since Ellestad was shown by his own evidence to have been contributorily negligent in entering the intersection. Judgment of dismissal was entered, and plaintiffs appeal.

The collision occurred at the intersection of north 38th and Woodland Park avenues. North 38th runs in a generally easterly and westerly direction, and Woodland Park, northerly and southerly. They intersect at approximately right angles, and each is approximately fifty feet in width.

The collision occurred about 4:30 p. m., on an April afternoon. The plaintiffs' car was proceeding west on 38th, Mr. Ellestad driving. With him in the front seat were Mr. Sontag and one of the Ellestad children, and, in the rear seat, Mrs. Ellestad and Mrs. Sontag. The defendant, Grace Leonard, with Miss Montoure as a companion, was driving northerly on Woodland Park. She was, therefore, the disfavored driver.

There was a hedge along the north line of the property on the southeast corner of the intersection which would obstruct the view of both drivers, but to what extent is not clearly shown.

■ The appellants' principal attack is directed at the court's finding of fact No. VII and the conclusion of law interwoven therein and repeated in the formal conclusions. The finding is as follows:

"That a proximate cause of said collision was the contributory negligence of the plaintiff Thomas Ellestad in entering said intersection and attempting to cross in front of the approaching car driven by the defendant Leonard when her car was only 30 to 60 feet from the intersection, and traveling at a speed of from 25 to 30 miles an hour; that the plaintiff Thomas Ellestad could, in the exercise of reasonable care, have avoided the collision."

The respondent invokes the usual presumption in favor of the trial court's finding. In our view, it is not necessary to do so, for, in so far as it is a finding of fact, the evidence overwhelmingly sustains it.

We find, at various points in the statement of facts, that Mr. Ellestad testified as to the distance of the defendant's car when he started to cross:

"Q. When you first saw this car you say was about the time you entered the intersection? Or where were you? A. When we started in, yes. Q. Can you tell the court approximately how far this car was away from you then? A. It looked to me like it was 30 or 40 feet away when we started in to the crossing."

He reiterated this upon cross-examination:

"Q. How far from the intersection do you say Miss Leonard's car was when you first saw it? A. Well, we pulled up like I always do when I pull up to an intersection, and looked down to see if any one was coming. That is when we first looked. We didn't seem to see any one and we pulled into the intersection and then they looked to be about 30 or 40 feet away coming up the road."

At another point, he said that they were possibly twenty-five or thirty feet away as he was just going into the intersection. (St. 9.) He further testified:

"Q. There was some visibility across the corner? A. Yes. Q. Now, I understand the first you noticed the car of the defendant was after you had gotten into the intersection? A. No, when we came up to it. The car was far enough away I thought we could go on through. Q. About how far was it? A. Well, it looked to me like it was thirty or forty feet away when I first saw it. Q. As far as from here to the wall? A. Yes. Q. And it was going what speed? A. I would say better than thirty miles. Q. Do you know how long it takes a car to cover that distance? A. No, I never heard. It was possibly farther away than that when I first saw it; yes, when I first saw it it was farther away than the wall."

(There is nothing in the record to show how far "farther away than the wall" was. We assume that, since Ellestad had testified three times that the car was thirty to forty feet distant, the finding of the court that it was "30 to 60" is a concession to the wall testimony.)

Mr. Sontag, one of Ellestad's companions, testifying on his behalf, placed the defendant's car even nearer than Mr. Ellestad had done:

"Q. When did you first notice the car, the Drive-Yourself car, that she was operating? A. Well, it looked like, — Distances are deceiving, but it looked like 25 or 30 feet away. Q. That was as soon as he cleared the hedge? A. Yes."

There is no other testimony on this subject.

Appellants further except to finding VII on the ground that it says that defendant Leonard was traveling at a speed "of from 25 to 30 miles an hour," she having testified: "Between 20 and 25." But the trial court was appraising Ellestad's conduct in the light of the facts as they appeared to him when he started across the road. Ellestad himself testified as follows:

"Q. Can you tell how fast the girls were traveling when they struck you? A. I would say they were going 30 miles or better."

Mr. Sontag, when asked at what speed the defendant and her companion were traveling, answered:

"A. That is hard to tell, but it looked like between 25 and 30 miles an hour, because when they did hit they turned us completely around and took us across the street and over the curb, and,— Oh, they must have been going that fast."

There is no evidence in the record as to the speed of defendant's car other than that already stated. The factual portion of finding VII is, therefore, amply sustained.

Both Mr. and Mrs. Ellestad testified that they were traveling from fifteen to eighteen miles per hour as they approached the intersection. Mr. Sontag said, eighteen, and that, if Ellestad's brakes were good, he could have stopped in "10 or 12 feet." There is no evidence as to the condition of the brakes, but Ellestad was driving a new car of standard make which he had purchased but two days before and had driven but sixty miles. There is no evidence to the effect that Ellestad could not have stopped his car at the intersection. No claim is made in the appellants' brief that he could not. In fact, it is inferentially admitted in appellants' statement of questions involved that Ellestad had freedom of choice as to that; for, after stating their version of the facts, the appellants say that the question presented to this court is:

" . . . does the favored driver have the right to proceed under the assumption that the right of way will be yielded, and if such favored driver proceeds, can he be found and held to be contributorily negligent merely and only because he does not actually anticipate that the disfavored driver will not at any time prior to striking the rear end of the favored car, slacken his speed or change his course so that a collision could be averted?"

All of the evidence is to the effect that the defendant was driving nearly in the middle of the fifty-foot street. The court found that the front wheels of plaintiffs' car had crossed the center line of the street when the collision occurred. The photographs of the plaintiffs' car show that it was hit squarely in the middle, between the left front and left rear wheels.

As to the trial judge's conclusion that Ellestad was negligent in entering the intersection, the appellants complain that he arrived at it by literally applying the testimony of the witnesses as to distances and speed, although, it is urged, they were but mere estimates. Doubtless, they were. These estimates, however, were the only data he had. They were furnished by the driver of plaintiffs' car and by one of his passengers. No one questioned or disputed them. We find nothing in the record that would have warranted the trial judge in holding them to be wrong; nor are there any facts or circumstances shown therein which would have warranted him in substituting gratuitous estimates of his own. We accept the court's factual finding, and on that basis take up the question which appellants have submitted.

█ The appellants urge, and correctly, that they had the right of way. They further contend that Ellestad had the right to assume that the defendant would obey the law and yield the right of way, if necessary. The rule invoked is a sound one and has been applied in many cases. But, in the light of the evidence which we now quote, it is apparent that he had no right or reason to assume that she would do so. Ellestad himself testified as follows:

"Q. What was Miss Leonard doing at the time [When he drove into the intersection]? A. They looked to us like they were looking out the side of the car. Q. Which side? A. To the left side. . . . Q. I want to know if it was towards Aurora they were looking? A. *Yes. She kept on going. They were looking west*

*away from us.* Q. Did they ever turn, so far as you could see, turn their attention to your car at all? A. No. They did not until they were right upon us, and when they saw us it scared them so they just threw their hands up and then it just happened so fast, there wasn't much time. Q. *When you first saw them they were looking away from you?* A. *Yes.* Q. And they did look towards you just before the impact? A. Seemed to be talking there, and their attention did not seem to be directed on driving, is what I mean." (Italics ours.)

Mr. Sontag alludes to this also:

"Q. Would there have been sufficient room for them to go to the rear? A. Yes, if they had been looking, but they didn't even touch a brake. If they had touched a brake, we would have gone right by. But, as Mr. Ellestad said, they were visiting, conversing, and when they did see us they became nervous and excited and forgot even to touch the brakes, or anything. There were no skidmarks on the pavement. I went there and looked."

The defendant driver admitted that she was looking to her left and made an unsuccessful attempt to excuse her action in so doing.

"A. Well, we were looking towards Aurora and I just didn't see this car up to the time, — THE COURT: Speak a little louder. A. (Continuing) I say I was looking towards Aurora Avenue. We were thinking of turning off the next street, and Minnie, this other girl, spoke to me and said, — She saw the car first and she called my attention to it, and I turned around in time just to see it, and I knew I couldn't avoid hitting it, and I put my foot on the brake. I know I did."

On cross-examination, she testified:

"Q. You intended to turn to your left? A. The next street, I think. Q. Were you in doubt? Is that the reason you were looking? Were you in doubt as to whether you were to turn on the next street or not? A. Yes. Q. You were not sure whether you would turn there or not? A. Yes. Q. That was the reason you were looking to your left? A. Yes."

It, therefore, must be accepted as a fact that the defendant was looking to her left and was oblivious of the presence of the Ellestad car, and that Ellestad knew it.

The question, then, becomes: Was the favored driver approaching an intersection at a speed of fifteen to twenty miles per hour, with a driver only thirty to sixty feet away approaching the intersection from his left at a speed from twenty-five to thirty miles per hour, entitled to assume that such driver would yield him the right of way when it was apparent to him that she was looking in the other direction and was totally oblivious of his presence? Such an assumption would, manifestly, be contrary to fact.

 Courts are extremely reluctant to deny a remedy to a favored driver where the disfavored driver has been grossly negligent. But the fact that the favored driver is entitled to the right of way does not absolve him from exercising ordinary care for his own safety. In this case, it must have been apparent to Ellestad that, unless he gave up his right of way, a collision was, at the very least, highly probable. According to his own testimony, he drove squarely into the path of an automobile which was almost upon him, although he knew that its driver was utterly oblivious of his presence. There is no such thing as a right of way to run into an unnecessary collision.

There is a strong analogy between our statutory rule governing the conduct of drivers at intersections and the rules governing steam vessels on crossing courses at sea.

"Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side [that is, approaching from the right] shall keep out of the way of the other." 33 U. S. C. A. § 204.

This is equivalent to our statutory crossing rule which requires an operator of a motor vehicle to keep

out of the way of another approaching the same crossing from the right. But the admiralty rules further provide:

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed." 33 U. S. C. A. § 206.

Here, the privileged or favored vessel—unlike the favored automobile—is mandatorily required to keep her course and speed. Yet, there are numerous decisions in which a favored vessel has been held negligent in so doing. Shortly before his retirement from the supreme court of the United States, Chief Justice Hughes said, in delivering an opinion holding the master of a favored vessel negligent in insisting upon his statutory right of way in the face of obvious danger:

"The so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision." *Postal S. S. Corp. v. El Isleo,* 308 U. S. 378, 387, 84 L. Ed. 335, 60 S. Ct. 332.

In closing that opinion, and in an apparent effort to mitigate its seeming harshness, the chief justice quoted from *The Quogue,* 47 F. (2d) 873, as follows:

" 'It is a hard rule which requires a master when he sees another vessel about to cross his bow with wanton disregard of his rights to stop and allow the arrogant usurper to pursue his wrongful course. But safety is better than pride; and however slight the hope that rules to promote safety will be observed under such circumstances, whatever courts may say, the vessels must be judged according to their legal duties.' "

This, we think, is as applicable to automobile drivers as to masters of vessels. Indeed, somewhat more so, for the master is under a statutory command to keep

his course and speed, while the automobile driver is not.

The judgment of the trial court is affirmed.

SIMPSON, C. J., STEINERT, JEFFERS, MALLERY, and GRADY, JJ., concur.

BLAKE, J. (dissenting)—As I view the evidence, the plaintiff was confronted with an emergency which was created by defendant's failure to observe him as he entered the intersection. Defendant was then thirty or forty feet south of the intersection and traveling in excess of thirty miles an hour. Plaintiff was traveling fifteen to twenty miles an hour. He had twenty feet to go to the point of collision; she, fifty or sixty. He had the choice of going ahead or attempting to stop. If he had made the latter choice, obviously, he would still have been hit—only further toward the front of his car. For, he could not possibly have avoided stopping in the path of defendant's car.

There are two rules applicable to the situation: First, plaintiff, as the favored driver, was entitled to proceed until, by the exercise of reasonable precaution, he observed that defendant, the disfavored driver, was not going to yield the right of way. Second, acting as he did in the face of an emergency, which was not of his own creation, he is not chargeable with negligence because of wrong judgment. *Reed v. Tacoma R. & P. Co.,* 117 Wash. 547, 201 Pac. 783. In that case, the court said, p. 549:

"Error of judgment is not necessarily negligence. The correct test in cases of this character is, did the person act as a reasonably prudent person would have acted under similar circumstances? The mere fact that one errs in judgment is not conclusive proof that he did not act as a reasonably prudent person would have acted under like circumstances."

In the emergency with which he was confronted, I think that plaintiff took the only course that might

have avoided a collision. He should not be charged with negligence because the choice made was ineffectual.

BEALS and MILLARD, JJ., concur with BLAKE, J.