**THE NO. 7.**

**THE SANTIAGO.**

**SANTIAGO S. S. CO., Limited, v. UNITED STATES.**

**THE NO. 152.**

**Nos. A–16793, A–16824.**

**District Court, E. D. New York.**

**July 16, 1945.**

Hagen & Eidenbach, of New York City, for Great Lakes Dredge & Dock Co.

Kirlin, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for claimant Santiago Steamship Co., Ltd.

Miles F. McDonald, U. S. Atty., of Brooklyn, N. Y. (Nicholas J. Healy, 3d Sp. Asst. to Atty. Gen., of counsel), for the United States.

BYERS, District Judge.

On March 12, 1943, Drill Boat No. 7 lay about 300 feet off Jackson Street in the East River, held in place by four spuds, and on her offshore side a scow was made fast, loaded with dynamite. At about 10:45 A.M., E.W.T., these vessels were struck by the S. S. Santiago which was descending the East River; the dynamite scow being sunk, and the Drill Boat suffering structural damage.

These causes present the single question of whether the collision was the result of faulty navigation on the part of the S. S. Santiago, or of faulty navigation on the part of U.S.S. D.D. No. 152, which at about 10:42 A.M. crossed the river from the Navy Yard, and was so maneuvered that she crowded the S. S. Santiago and forced her to strike the other two vessels.

In the first cause, the owner of Drill Boat No. 7 and the scow seeks recovery against the S. S. Santiago and the United States of America, alleging fault by each vessel; and in the second cause the owner of the S. S. Santiago seeks recovery from the United States of America for the damages alleged to have been suffered by the steamship. In both causes, relief is sought against the Government under the Public Vessels Act, § 1, 46 U.S.C.A. § 781, in rem and in personam.

Findings

1. Ownership and operation of the several vessels involved were stipulated in both causes to be as pleaded, and are so found.

2. Drill Boat No. 7 has a steel hull, and her dimensions are 136 feet by 41 feet by 10-foot sides. She was equipped with four spuds, one on each corner, and four drill frames. The scow was made fast on the lower offshore corner of the Drill Boat, and her dimensions were 12 feet by 4½ feet (depth not given).

3. The width of the river, measured from the end of pier 44 (just below the Drill Boat) to the opposite pier on the Brooklyn side, is about 1,000 feet, and the distance from the outshore side of the Drill Boat No. 7 to an imaginary line drawn from pier A in the Navy Yard to pier J, to establish the entrance to the Yard for present purposes, is but little less.

4. At about 10:45 A.M. on the day in question, there was a flood tide of the agreed strength of 3 knots an hour, which at this time tended to set against the Manhattan shore; there was no effective wind, and visibility was good.

5. The S. S. Santiago is a steel ship, single screw, and her dimensions are 346.1 feet by 49.6 feet by 26 feet, and she was loaded to her full capacity. Her indicated horse power was 750, and full speed upon her engines developed a speed of 7½ knots an hour. She is owned by a Greek corporation and was operating under Panamanian registration.

6. On this day, the S. S. Santiago left City Island, bound for an anchorage in the North River, preparatory to joining an overseas convoy; at Hunt's Point, she picked up the steamtug John T. Timmins, which was made fast on the steamer's starboard side near the bow.

Coming down the East River and passing under the Williamsburg Bridge, the S. S. Santiago was making not to exceed 7½ knots through the water, which was about 4½ knots over the ground.

7. As the Santiago approached Corlears Hook, she was close to the center of the river but favoring the New York shore.

8. The navigation of the Santiago was in charge of William H. Myers, a licensed pilot for these waters for the past thirty years, who began his duties at City Island, from which departure was had at about 7:30 A.M.; the ship's master was not on board; his presence being required at a conference of convoy captains.

9. Myers was on the bridge as was also the chief officer Zolotas and also a helmsman.

10. A boatswain and a sailor were on the forecastle head, tending the anchor, and ready to drop it in the event of emergency. There were also two representatives of the Coast Guard on deck, who did not act as members of the crew. The men on the forecastle head were in a position to act as lookouts.

11. After passing under the Williamsburg Bridge and as Corlears Hook was reached, the Santiago was put under right rudder to make the necessary turn to starboard, and approached Drill Boat No. 7 so as to clear it by about 300 feet, and would have done so, had her course not been changed of necessity, in order to avoid collision with the No. 152, which was headed on a course which would have caused her to come close to or collide with Drill Boat No. 7, had her own helm not been so ordered that she rounded to her port hand directly ahead of the course of the Santiago as it was before the latter veered sharply to the right, causing her to strike the Drill Boat No. 7 and the dynamite scow.

12. The No. 152 is a 4-stack, twin screw destroyer, described as of World War One vintage; her dimensions are 314 feet by 31 feet and draft 12½ feet, and at the time in question she had two boilers in use, and.

her indicated horse power was 14000. Her standard speed as set for this trip was 15 knots, and two-thirds speed was 10 knots, and one-third speed was 5 knots.

13. She crossed the imaginary line heretofore stated as indicating the entrance to the Navy Yard, at 10:42 A.M., and her quartermaster's record as to engine and rudder movements is as follows:·

"10.42 Rudder amidships
All engines ⅔ ahead
Full left rudder—2 Bls. (Blasts?)

"10.43 All engines ahead Standard—2 long blasts

."10.44 2 Blasts. Rudder amidships. 1 long blast

"10.45 All engines stop—Full left rudder

"10.46 All engines ⅓ ahead. 1 blast
Left Rudder 15°
All engines stop
1 Blast—Full left rudder
Rudder amidships
All engines ⅓ ahead

"10.47 Rudder amidships. Left rudder 15°
Ease and meet

"10.49 Pilot S. J. Kelly left ship. Captain takes con."
takes Con."

14. As the No. 152 started from the Navy Yard entrance to cross the river, a Pennsylvania Railroad tow, composed of 5 loaded barges and a helper tug, was ascending in charge of the tug Overbrook, and the latter was about off Gold Street on the Brooklyn side, about 700 feet below the No. 152.

15. The presence of the said Pennsylvania tow was known to the No. 152, but did not interfere with her navigation.

16. The presence of the Santiago, as she was about to round Corlears Hook, was observed by the pilot of the No. 152.

17. The No. 152 was in charge of Commander James G. Marshall, U.S.N.; the executive officer was Lt. Commander David M. Kellogg, who was on the bridge at the time in question. Navigation was conducted by pilot Sidney J. Kelly, described as a regular Navy Yard pilot holding licenses as master and pilot in New York Bay and the East River to Stepping Stones. The helmsman was Jules P. Herbert, whose rating is that of chief torpedo man.

18. The course of the No. 152, as she headed out of the entrance to the Navy Yard, was in the direction of Drill Boat No. 7, and the flood tide took effect on her port side as she crossed the river under the full left rudder noted in the quartermaster's record, and she turned directly ahead of the Santiago after having appeared to be headed into collision with her, and finally straightened away down the river after having cleared the bow of the Santiago by not more than 50 feet.

19. The two blast whistle signal blown by the No. 152 as she passed out of the entrance to the Navy Yard was directed to the Santiago.

20. That signal was not observed by or heard aboard the Santiago, and was not answered.

21. No alarm signal was blown by the Santiago.

22. The No. 152 when first observed from the Santiago was close aboard to port, and was traveling at such a speed and on such an apparent heading as to cause the pilot of the Santiago to fear that there would be a collision between the two vessels, and accordingly he put his engines full astern and ordered a hard right rudder almost simultaneously, in order to avoid such collision, and his decision was made in an emergency.

23. As soon as it was seen on the Santiago that the danger of collision with the No. 152 was no longer present, the Santiago sought to avoid collision with the Drill Boat No. 7 and the dynamite scow, by moving full ahead under a left rudder with the help of the tug Timmins, which caused the Santiago to swing to her own port; this brought her starboard quarter into contact with the dynamite scow and the Drill Boat No. 7, causing the damage for which the libel in the first cause was filed.

24. Had the Santiago not been crowded by the No. 152, she would have cleared both the Drill Boat No. 7 and the dynamite scow by not less than 100 to 150 feet.

25. The striking of the Drill Boat No. 7 and the dynamite scow by the Santiago was due solely to the manner in which the No. 152 was navigated, and was not due to any fault in the navigation of the Santiago.

## Discussion

The episode which it has been the object to portray in the foregoing dissected form

is really not in dispute in its essential elements. The situation may be clarified by the following sketch traced from the chart. Government Exhibit No. 1:

No one argues that the No. 152 did not cross the river and did not turn abruptly from a position close alongside to port of the Santiago, to one directly ahead of her course down the river, and the advocacy of the Government is directed almost entirely to the contention that the Santiago should be deemed to have contributed a measure of fault, because of the lack of a competent lookout who would have been in a position to warn the pilot of the two blast signal given by the No. 152 at 10:42 A.M. as above stated.

The difficulty with that argument is that Kelly, the pilot of the No. 152, was unwilling to commit himself flatly to this being a crossing situation in which his was the burdened vessel, although he seemed at times to realize that such might be the fact. His vacillation will appear from the following quotations: After saying that, as he was passing out of the entrance, he had a full vision of the river:

"Q. What did you blow the two blasts for? A. For the steamer that was approaching from up river to signify that I was directing my course to port and going down the river.

"Q. Do you say that there is a rule in the Rules of Inland Navigation which permits you to blow a two blast signal indicating that you were putting your wheel to port—is there any such rule? A. I didn't say there was."

As to the second two blast signal:

"Q. Will you read the entry at 10:43? A. 'All engines ahead, standard, two long

blasts.' (He continues his answer) At 10:42 there is two blasts, too.

"Q. At this time this steamer, if it was the Santiago, was off your starboard quarter and you were straightened down the river? A. That is right, running free and going down the river.

"Q. Who were you blowing the two blasts to? A. The Santiago.

"Q. What did you mean to signify? A. A signal of intention that I was proceeding. He was climbing up on my starboard quarter at that time. There was no imminent danger of collision but it is merely a courtesy signal of intention and that was blown.

  *  *  *  *  *

"Q. You were just being courteous to the Santiago? A. It means that.

  *  *  *  *  *

"Q. What speed were you going after 10:42? A. The engine speeds indicated here after 10:42 is two-thirds on both engines.

"Q. That is ten knots? A. Making turns for ten knots. It don't necessarily mean that they were making ten knots.

  *  *  *  *  *

"Q. Did you obtain permission from the Santiago to cross her course? A. No, I did not and I did not cross her course.

  *  *  *  *  *

"The Court: Please try again. When you gave him the two blast signal, did you intend to cross his course?

"The Witness: Well, yes.

  *  *  *  *  *

"The Court: I think we ought to exhaust the subject further.

"(To witness) When you blew the first two blast signal, you intended to cross his course?

"The Witness: We were across his course.

"The Court: At the first two blasts?

"The Witness: Yes, he was then ranging from up river. His position then was about one point off my starboard quarter. We never at any time came out of the Basin at a ninety degree turn, we came out at an angle turn.

  *  *  *  *  *

"Q. At the time that you crossed the line, which you think was at 10:42, where the quartermaster shows the first signal of two blasts, did you blow that two blasts to this steamer to indicate that you were going to cross her? A. Yes.

"The Court: (To witness) Now, did you expect to get an answer to that?

"The Witness: From the position of the vessels, yes.

"The Court: Did you get an answer?

"The Witness: No.

"The Court: Was that vessel the privileged vessel?

"The Witness: No.

"The Court: Why not?

"The Witness: Due to the fact from her position at that point she was—her bearing was one point abaft my starboard quarter and it would be merely a courtesy signal and it was not answered."

The witness' vacillation is thought to indicate that he did not realize at once, as the No. 152 made out of the Yard and across the imaginary line, that a crossing situation would be necessarily involved, and that he decided to proceed in the general direction of the Drill Boat No. 7, trusting to be able to effect a turn to port and down the river at about the center, but that the force of the flood tide, against his port side on the way across, tended to widen the arc of turn so that he found himself unable to complete it without crossing the expectable course of the Santiago; and while he was able to bring off the delayed maneuver so as to avoid collision with the steamer, it was a rather close thing, and he did not succeed in straightening away until the No. 152 was directly ahead of the Santiago and at a distance of not more than fifty feet.

If this is the true explanation, it is difficult to see how the lookout on the Santiago would have been able to interpret the two blast signal, which Kelly describes as a gesture of courtesy, as actual notice that it was intended to put the privileged vessel in a crossing situation under the necessity of reversing her engines and otherwise surrendering her privilege: Postal Steamship Corporation v. El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335.

The precise heading of the No. 152 moving out of the entrance to the Yard is not shown in convincing manner. That initial heading would determine, subject to the pressure of the tide, the course of the No.

152 in moving into the stream and down toward the Battery.

The impression that I derived from Kelly's testimony and manner on the stand was, that the vessel in his charge was entitled to proceed, even so small a matter as 3½ times her own length, pretty much as she chose, and that other craft of civilian status must govern themselves accordingly.

The inference as to what actually happened, which has been stated, is somewhat fortified by the testimony of Bennett, the captain of the Dalzell tug which assisted the No. 152 to make her turn while she was yet in the Navy Yard, and which followed her down the river for the purpose of taking off the pilot. Referring to a statement which he was thought to have made, he testified:

"A. * * * I said that I did not pay much attention but I did not know what caused her (the No. 152) to go way across the river.

\* \* \* \* \*

"Q. Didn't she go over close to the New York side? A. Well, she was pretty well over."

(See full left rudder at 10:45, finding 13)

The testimony of Commander Marshall and Lt. Commander Kellogg, to the effect that as they observed the Santiago she was coming up so fast that it was necessary for the No. 152 to get out of her way, should in charity be attributed to a lapse of memory. The former estimated the speed of the Santiago at eleven or twelve knots through the water, which would be eight or nine knots over the ground. And the Lt. Commander said: "As we were about halfway across the river I noticed the Santiago to be overtaking us rapidly * * *."

How a vessel that was making four and one-half knots over the ground could be overtaking a destroyer moving at ten knots, being two-thirds full speed, is difficult to understand—to indulge in an understatement.

▮ It results that the fault of the No. 152, in crossing the Santiago's course, and in crowding her as stated, is found to have been the sole effective cause of the collision between the Santiago and the Drill Boat No. 7 and the dynamite scow; in consequence it is concluded that in the first cause the libelant should have a decree against the United States of America with costs, and the libel against the Santiago

should be dismissed without costs; and in the second cause that the libelant should have a decree against the United States of America with costs.

Settle interlocutory decree.