THE PEARL HARBOR.

THE HARVESTER.

THE R. LENAHAN.

THE GILBERT BENEDICT.

DREYFUS et al. v. HEDGER TRANSP. CO., Inc.

No. 50.

Circuit Court of Appeals, Second Circuit.

Dec. 3, 1934.

See, also, 60 F.(2d) 571.

Purdy & Purdy, of New York City (John E. Purdy and Edmund F. Lamb, both of New York City, of counsel), for appellants Pearl Harbor Co., W. E. Hedger & Co., and Hedger Transp. Co.

Otto & Easterday, of New York City (Henry E. Otto, of New York City, of counsel), for libelants Louis Dreyfus & Co.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellee L. & L. Canal Line.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The barge Harvester carried a cargo of wheat from Buffalo to New York and was

proceeding eastwardly through the Barge Canal in tow of steam tug Pearl Harbor. The grain belonged to Louis Dreyfus & Co. and was carried under a contract that the latter had made with Hedger Transportation Company which for that purpose had chartered the Pearl Harbor and four barges (one of which was the Harvester). The carriage was subject to the New York Produce Exchange form of contract which provided that:

"The boat owner and/or operator and/or carrier shall be responsible for all damage caused by their negligence or fault but shall not be liable for losses caused by dangers of navigation, fire, or collision, except where caused by their negligence or fault."

The Harvester was the hawser barge, towed by the Pearl Harbor on two 75-foot hawsers. She was 123 feet long and had a beam of 31 feet. Behind her was the Scully 114 feet by 29 feet, the Benedict 112 by 29 feet, and the Rafferty 112 by 29 feet, all towed tandem on two hawsers and close coupled in the order named. On August 25, 1928, when between Middleport and Gasport lift bridge, the Harvester struck the concrete wall on the south bank of the canal near her starboard bow corner, to the damage of her hull and of the cargo. The tow of the Pearl Harbor was equipped with a steering apparatus by the wheel of which, placed on the Scully, the Harvester could be swung some distance to port or starboard.

At the time the accident occurred the tug R. Lenahan, having a beam of 19 feet, was proceeding westward in the canal with a tow of six light barges. Each of them was 21½ feet wide, and they were towed two abreast, so that they had a total width of 43 feet. The length of the first tier was 149 feet, the second 109, and the third 149. None of the barges was equipped with a rudder or other steering apparatus, but they were close coupled, and their tug relied on this close coupling to keep them in line.

The Hedger Transportation Company contends that the Harvester collided with the concrete wall of the canal because the Lenahan's tow crowded her and got on the south side of the canal in a part of it where the channel was only 75 feet wide and the canal itself had a water surface of only 117 feet in width. It is said that in such a place there was not room for the tow of the Pearl Harbor to navigate with safety and the Lenahan should have held back and waited for her to pass. The Lenahan, on the other hand, argues that the wheelman on the Scully lost his head, ported his wheel so far and left it dogged that the Harvester ran into the concrete wall. The court below exonerated the Lenahan from liability, found that there was sufficient room for the tows to pass but for the negligent action of the Pearl Harbor and her tow, and held the Hedger Transportation Company as carrier primarily and the Pearl Harbor secondarily liable for the damage suffered by Dreyfus & Co.

This appeal is taken by the Hedger Transportation Company, the carrier, and by Pearl Harbor Company, as owner of the tug, and also by W. E. Hedger Company as owner of the Harvester. Dreyfus & Co. filed cross-assignments of error. In our opinion both parties were in fault and the damages should be divided.

The place where the Harvester struck the south wall of the canal was at the east end of the Watson spillway, and it is there that it is charged that the Lenahan tow crowded the Pearl Harbor and her barges. This spillway is a concrete structure built into the south bank of the canal, having an apron 62½ feet long. At each end of this apron and forming part of the spillway are two concrete wing walls sloping outwardly toward the channel. Under normal conditions but three feet of the wing walls are above the water surface on the bank and the rest of them is entirely under water. The barges of the Pearl Harbor were drawing about 10 feet, and when they proceeded on the southerly side of the canal they could only get 4 feet outside of the southerly bottom angle of the channel (which was 75 feet wide by 12 feet deep) without rubbing against the wall on their starboard sides. The water surface from the center line of the 75-foot channel to the southerly bank of the canal has a width of 37½ plus 24 feet, or 61½ feet.

The width of the water surface at the spillway between the center line of the channel and the northerly bank is 37½ feet (that is, one-half the width of the channel), plus 18 feet, or 55½ feet. The Lenahan drew 10 feet and her light barges only 2 feet of water. Her master testified that, when he had swung his tow to the starboard to pass the Pearl Harbor the Lenahan was 14 feet from the northern bank of the canal, and his barges were only 3 feet from it. Owing to the draft of the Lenahan, that was as

near the shore as he could get. That estimate would leave the line of barges 3 feet from the bank or 9½ feet away from the waters which the Pearl Harbor and her tow claim that they had the right to appropriate.

Proctors for the Pearl Harbor, however, insist that the testimony first elicited from the master of the Lenahan to the effect that his tug was 25 or 30 feet from the top surface of the canal showed that his tow was south of the middle of the channel and crowding the Pearl Harbor tow (fol. 972). But we think there plainly was confusion in this statement and that the master in giving those figures was referring to the distance of his tug from the Pearl Harbor and not from the north bank. This seems evident from the subsequent testimony (at fol. 973). Moreover, the statement of the master made later in the record, that the Lenahan stayed as far away from the northerly bottom angle of the canal as she could and at least 5 feet from it, so that she should not sheer, is thought to furnish additional evidence that the Lenahan's tow was off side at the time of the collision. But, if we assume that the Lenahan kept 5 feet from the bottom angle, her tow, if trailing straight, would still have been 1½ feet to the north of the center line of the channel.

The trial judge found that the Lenahan "kept her tow well to the north side of the channel. The head of the tow was close up to the bank though the tail may have swung off to mid-channel." For this finding there seems to have been ample evidence. This is so whether the Lenahan came as near to the north side as 14 feet or kept 5 feet from the bottom and thus 23 feet from the bank.

The Gasport lift bridge was about 1,200 feet east of the spillway. When the Lenahan was under this bridge she exchanged a one-whistle signal with the Pearl Harbor who was then about 1,000 feet west of the spillway. The Pearl Harbor pulled over toward the south side of the channel in accordance with the signal. The Lenahan also pulled to starboard and got her tow as close to the north side of the canal as she could. When the Pearl Harbor was passing the Lenahan, Brunner, who was stationed at the wheel on the bow of the Scully, concluded that there was danger of a collision between the Harvester, his hawser barge, and the on-coming tow of the Lenahan. He accordingly put his wheel hard-a-port, dogged it, and ran over to the starboard side of the tow to see how far off the spillway was in order not to hit the easterly wall. In the meantime his wheel, set hard-a-port, was swinging the Harvester toward the wall of the canal. When he discovered that she was going farther to the starboard than she ought, he ran back, threw off his dog, and started to rotate his wheel in the opposite direction, but too late to prevent the Harvester from colliding with the wall of the canal on the easterly side of the spillway. The Harvester passed the first tier of the Lenahan's tow without any contact. The trial judge found that the Pearl Harbor tried to nose off the second tier of the Lenahan barges but the last tier rubbed against the stern quarter of the Harvester. The damage done to the latter and her cargo was not, however, from any contact with the Lenahan's tow, but from the collision with the wall of the canal and spillway.

It is argued on behalf of the Hedger Transportation Company that the Lenahan's tow must have been on the southerly side of the channel and in the waters of the Pearl Harbor's tow because one of the barges of the Lenahan rubbed against the Harvester. But this is not sound. When the wheelman on the Scully put his wheel hard-a-port, the rear port corner of the Harvester, which was the portion of that barge that was rubbed by the Lenahan's tow, was swung out into the canal in a northerly direction about 15 feet beyond the perpendicular. As the Harvester had a beam of 31 feet, upon the assumption that her starboard bow had swung 4 feet beyond the south line of the channel and that her draft of 10 feet prevented her from swinging further, it may be demonstrated that her rear port corner extended 42 feet beyond the south line of the channel or 4½ feet into the Lenahan's waters. It is evident that she could have kept in the channel and still have had about 3 feet of water on each side but for the nervous, negligent steering of the helmsman on the Scully. Indeed, allowing for the slope of the wall, he would have had nearly 5 feet on each side without actually striking it. For this negligence the Hedger Transportation Company is liable.

Nevertheless, a long tow should not have been forced to pass through the eye of a needle, and the master of the Lenahan was negligent in not holding his tow back and letting the Pearl Harbor, who had the right of way, get by the Spillway. It is plain

enough that in going past it an east-bound tow had not the protection of the ordinary wall of the canal and that any misjudgment as to where the easterly wall of the apron might lie under water could result in serious damage.

Section 179 of the New York Canal Law (Consol. Laws N. Y. c. 5) was meant to guard against such crowding. It provides that:

"The master of a float going from the navigable waters of the Hudson river, approaching any place in a canal less than thirty feet wide upon the surface, or which will not safely permit its passing another float approaching the same place, shall stop at such distance from such narrow place as may be convenient for the floats going towards such navigable waters to pass through such place, and there wait until such passage is effected."

We think section 179 applicable to the portion of the canal at the Watson spillway, and regard it as manifest that the Lenahan should have held back. That this section applies to a west-bound tow proceeding on the barge canal was decided in Scow Monroe Doctrine—Scow John B. Garman, 1923 A. M. C. 606;[1] Herkimer-Dixie, 1926 A. M. C. 1693;[1] The Mary E. Sheridan (Brooklyn-Hugh O'Donnell) (D. C.) 58 F.(2d) 825, 1932 A. M. C. 815; Dr. George J. Moser and Tow, 1934 A. M. C. 1259.[1]

The following clause of regulation 8 of the Department of Public Works of the State of New York, Division of Canals and Waterways, is likewise applicable to the situation:

"Owing to the fact that many sections of the improved canal have a bottom width of 75 ft. only, boats exceeding 36 ft. in width must use extreme care in passing other floats in order that no interference may result to the interests of general navigation in such sections. * * * "

Certainly it was not "extreme care" on the part of the Lenahan to attempt a passage where the clearance was so slight.

For the foregoing reasons, the damages should be divided between the Hedger Transportation Company and the L. & L. Canal Line, with limitation of liability to the latter, and the decree is modified accordingly.

[1] Summary.