## THE MORTIMER B. FULLER.

## THE WARREN W. CLUTE.

## THE MICHIGAN.

## STANDARD TOWING CORPORATION v. MICHIGAN ATLANTIC CORPORATION.

### No. A15599.

District Court, E. D. New York.
March 29, 1940.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for claimant.

BYERS, District Judge.

The libelant, as owner of the barges Fuller and Clute, seeks recovery against the motor tanker Michigan for damages sustained by the barges on October 23, 1938, in the New York State barge canal, immediately southerly from Lock No. 8 in the Oswego River section, arising from contact between the Clute and the Michigan which resulted in damage also to the Fuller abreast of the Clute in a westbound tow.

The diesel tug Gramercy was the towing vessel and a petition to implead her was filed; in lieu of an answer, it was stipulated at the trial that she is of the same ownership as the damaged barges, and that any fault on the part of the Gramercy is chargeable to the libelant.

The substantial facts are not in dispute, save as to the precise place of collision. That is of controlling importance, because if it happened at about the knuckle on the easterly wall of the canal under the railroad bridge southerly from Lock No. 8, as asserted by the libelant, responsibility should be attributed to the Michigan for having proceeded so far eastbound, because she had been apprised that the libelant's tow was

---

leaving Lock No. 7—about 2,000 feet from Lock No. 8—at the time when the Michigan emerged from the latter. The lock tender deposed that he gave this information to either the master or the mate in charge of the vessel. What he said was: "Watch your step, proceed with caution, there is a fleet about to leave 7 or in 7."

For the Michigan it is contended that the contact took place north of the knuckle, where the width of the canal is 96 feet. If that were shown, it would seem that the westbound tow had room to pass the Michigan, and the contact could have resulted only from faulty navigation on the part of the Gramercy.

The nature of the damage is consistent with the libelant's theory, because the two head barges were squeezed together against the easterly concrete wall, and the breaks in the knees or breast hooks as they were called, in the lower part of the starboard bow, as to the Clute, indicated lateral pressure rather than a head-on impact; as to the Fuller, planks were broken and breast hooks were loosened and broken, at the bow.

The libel charges the Michigan with failure to stop and hold back to permit the Gramercy and her tow to enter the wide waters of the canal; and with proceeding into the narrow waters (at the knuckle) in spite of knowing of the presence of the Gramercy and her tow; and with failure to stop and back in time to avoid collision.

The Michigan charges the Gramercy with negligence, and alleges that the damages suffered by the barges were due to their unseaworthy condition or were sustained at other times and places. There was no evidence offered to demonstrate unseaworthiness.

The make-up of the Gramercy tow was criticised at the trial, although not pleaded, and perhaps something should be said about it; the tug is 63.8 feet in length by 18.8 feet in beam, and has 150 horse power diesel engines.

The Fuller and Clute, being towed abreast in the first tier, are each 101.4 feet in length by 21.5 feet in beam, and were light, as were the barges Rose and Mary E., being towed astern in tandem. The 25-foot hawsers from the Gramercy ran to the port bow corner of the Clute and the starboard bow corner of the Fuller, leaving a space of about 15 feet between the stern of the tug and the bows of the barges.

The Rose and the Mary E. each had a beam of about 34 feet, which explains why they were not towed abreast.

The greatest width of the tow was about 44 feet, representing the combined beams of the head barges and the space of one foot by which fenders separated them.

The Gramercy tow got under way at about 6:15 p.m. and proceeded at a speed of a mile an hour, so that it would require about 23 minutes for her to cover the 2,000 feet to Lock No. 8.

The make-up of the Gramercy tow was shown to have been in accord with prevailing practise, and there is no evidence of any requirement that the vessels should have been towed in single file. It is testified for her that, while in Lock No. 7, running and towing lights on the tug were lighted, and that there was an oil lantern placed at the port bow of the Clute and one at the starboard bow of the Fuller, and one or two lights were displayed on the Mary E., the last barge of the tow. While it was said for the Michigan that only the light on the Fuller was observed, this is not deemed to be sufficient to overcome the affirmative testimony for the libelant on that subject; moreover the Michigan saw the towing as well as the running lights on the Gramercy, so that in addition to the warning given by the lock tender, she was amply apprised of the advance of the Gramercy tow, and of the necessity thereby created for proceeding with caution.

The eastbound motor ship Michigan is of steel, 254 feet long by 36 feet in beam, draws 10 feet, and has motors of 360 horse power. She was laden, and rode lower in the water than the barges in the Gramercy tow.

She moved out of Lock No. 8 at about 6:15 p.m., and proceeded slow ahead under one bell for one and a half to two minutes and then her engines were stopped; according to the testimony of the mate in charge of navigation, it would not take over three minutes for her to lose her way. However, it appears that within that time her engines were put into reverse, and that was the engine movement, according to the same witness, when he blew a one whistle in answer to the Gramercy's one, which is called blowing "for sides". Probably it did not mean a passing so much as an assurance that each vessel was close to its starboard side of the canal.

The Michigan was hugging that wall and she had to travel about 645 feet to reach

the railroad bridge, already referred to, which crosses the canal diagonally; the narrowest channel is at about the knuckle, so that the Michigan would have proceeded about two and one-half times her own length to reach it. It is thought that she did proceed so far, under the engine movements which have been described.

For the Gramercy, the testimony is that, when she was around 300 feet southerly from the railroad bridge, she blew a 3-blast hold back whistle to the Michigan, having observed that the latter was proceeding without apparent attention to the tow; having received no answer, the Gramercy shut off her engines and the tow moved forward under its own momentum only, and so it was that the collision could not be avoided since the tow, having a width of 44 feet, could not pass a vessel having a beam of 36 feet in a channel which was 79 feet wide.

The reason that the Michigan's version is not accepted is that she urges that contact took place northerly from the bridge (at the end of the "basin") where there is a width of about 96 feet, caused by an easterly inclination of the easterly concrete wall; at a distance of 75 feet northerly from the knuckle, there is indeed that width of channel.

If the contact had taken place where there was a possible clearance of 16 feet, the Michigan and the barges would not have been wedged together, and yet that is the way that Gustafsen, the engineer on duty on the Michigan, described what he saw when he went up on the deck after receiving the bell that caused him to go astern on both engines, and then stop. He says: "I went up to see what was the matter, and I saw we were wedged together, and that is all I did, and I went down below again."

The three vessels would not have been wedged together where the canal was 96 feet wide. Consequently it is concluded that the vessels were in contact, and the squeezing damage was done under the railroad bridge, at about the "knuckle", as described by Marble, the captain of the Clute, and Wagner, the captain of the Fuller.

The apparent difference in their testimony, as to the relative positions of their barges to the overhead railroad bridge at the time of the squeezing, does not weaken this view, because of the diagonal course of the bridge which has been stated; the bow of the Clute would seem to her captain to be beyond the bridge, while the bow of

the Fuller would seem to be under the bridge, and they could still be abreast and almost straight in the canal.

It is argued, but it was not pleaded or sought to be proved, for the Michigan, that it was the duty of the Gramercy tow to stop and wait well below the knuckle, where the canal was over 90 feet wide, since eastbound tows have the right of way, and that section 179 of the Canal Law, Consol. Laws, c. 5, Laws 1909, c. 13, reads against the Gramercy's navigation; reliance is had upon The Pearl Harbor, 2 Cir., 74 F.2d 58.

So far as the right of way is concerned, there seems to be authority for it, somewhat tersely stated in some of the cases referred to in the decision cited, which involved widely different facts.

█ If that was the rule of navigation on the canal, it is presently deemed to be subject to application in the light of what was said by the Supreme Court in Postal S. S. Corp. v. The El Isleo, 60 S.Ct. 332, 336, 84 L.Ed. —— (Jan. 2, 1940) namely: "The so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action." That expression had to do with a crossing situation with respect to which the Inland Rules are clear and explicit, which can hardly be said of the right of way claimed for the Michigan, even though section 179 of the Canal Law (repealed in 1939) did provide as to westbound craft approaching "any place * * * which will not safely permit its passing another float approaching the same place, shall stop at such distance from such narrow place as may be convenient for the" eastbound float "to pass through such place, and there wait until such passage is effected".

█ Assuming the Michigan to have been the privileged vessel, as she and the Gramercy approached the knuckle, the evidence shows that, while at a distance of about 300 feet below, the latter blew a 3-blast whistle, requesting the former to hold back. No one deposes that she had no right to do so.

That signal was not answered, and as soon as it became apparent to the Gramercy that the other vessel intended to proceed, she stopped her engines. Nicety of calculation was difficult, since it was between dusk and nightfall, and that action was compatible with an intention to hold the tow below the "knuckle" to accommodate the Michigan.

328

Much of this is left to rationalizing because no evidence on the subject was offered at the trial.

Since the Gramercy could not check the momentum of her tow, and since the Michigan did not go into reverse until too late to avoid damage, and in view of the lock tender's admonition, it is not thought that the Michigan can rely upon her belated assertion of a right of way, to evade the consequences of her own lack of care.

To summarize, it is deemed that the evidence establishes:

A. Libelant's tow was properly made up, when it proceeded from Lock No. 7, at about 6:15 p.m., on October 23, 1938.

B. The tug Gramercy blew a 3-blast hold back signal to the Michigan, when more than 300 feet separated the vessels.

C. The Michigan did not answer that signal.

D. The Gramercy stopped her engines as soon as her navigator realized that the Michigan was proceeding on her course, without regard to the hold back signal.

E. The Michigan had been warned at Lock No. 8, to proceed with caution as a tow was leaving Lock No. 7. Her speed was one mile an hour when moving ahead, and in about seven minutes, she had proceeded about 645 feet.

F. The Michigan restricted her progress easterly as she had been advised to do, as the difference in elapsed times of the respective vessels indicates, but not sufficiently to accomplish the purpose of the lock tender's warning.

G. The Michigan did not reverse her engines in time to avoid meeting the head barges in the Gramercy tow at about the railroad bridge southerly from Lock No. 8.

H. The Michigan squeezed the Clute against the Fuller, causing the latter, in turn, to be squeezed against the easterly concrete wall of the canal, at about the "knuckle" under or near the said railroad bridge, causing the damage complained of in the libel.

I. The Michigan could have avoided this contact by not proceeding beyond the basin, immediately southerly from Lock No. 8, where the canal is 96 feet wide, until the Gramercy and her tow had safely passed, thus heeding the lock tender's admonition.

J. The Gramercy carried running and towing lights, which were burning.

K. The Clute and Fuller carried lighted oil lanterns at their respective outside bow corners.

L. The Gramercy could not have held back her tow at any time after it was evident that the Michigan was proceeding in disregard of the Gramercy's 3-blast hold back signal.

Conclusion

The Michigan is responsible for the damages sustained by the Clute and Fuller.

The libelant is to have the usual decree, to be settled on notice.