## ATLAS ASSURANCE CO., LTD., OF LONDON, ENGLAND v. THE CUPID et al.

### No. 3213-KA.

District Court, Alaska.
First Division, Ketchikan.

Dec. 3, 1952.

Ernest E. Bailey, of Stump & Bailey, Ketchikan, Alaska, for petitioner.

C. L. Cloudy, of Ziegler, King & Ziegler, Ketchikan, Alaska, for respondent.

FOLTA, District Judge.

The libelant, as subrogee, seeks to recover $6218.19 paid by it under a policy of insurance for repairs to the Motorship Tyee necessitated by damages sustained in a collision with the respondent, the Motorship Cupid. The claimant, alleging in his cross-libel that the Tyee was at fault, seeks to recover damages in the sum of $5650.

The collision occurred about midnight of April 24, 1950, on a clear night with fair visibility, in Tongass Narrows, a narrow channel, south of and connecting with Ketchikan Harbor. It is the route for all water traffic between Ketchikan and the United States and Canada. During the trial, the Court held that Tongass Narrows is a narrow channel within the meaning of 33 U.S.C.A. § 210. The Admiral Watson, D.C., 266 F. 122, 126.

The Tyee was outbound from and the Cupid inbound to Ketchikan. From the time they sighted each other at a distance of about two miles until they collided they were on a collision course. Not only is the evidence in sharp conflict but it is manifest that the collision could not have occurred in

the way related by either the libelant or the claimant. Indeed, it can not be satisfactorily explained except on the theory that both vessels were grossly at fault. The Cupid was on the wrong side of the channel. The master and lookout of the Tyee admitted that the vessels were approaching each other head and head and that every time the Tyee changed its course slightly to the right, the Cupid made a corresponding change to the left. Notwithstanding that the vessels were headed for each other, nothing was done to avert a collision until it was too late when the Tyee turned sharply to the right. The master of the Cupid testified that the vessels were on substantially parallel courses and in a starboard passing situation, notwithstanding which he blew a signal for a starboard passing. After taking this superfluous precaution and obtaining no response, he took his eyes off the Tyee and the next time he looked, he said the Tyee was crossing his bow. Obviously he could not have been looking ahead or looking out at all or he would have seen this maneuver, at least with his peripheral vision. His admission that time did not permit him to even close the throttle before the vessels collided proves that he was doing something else at a time when he should have been watching the Tyee.

The stem of the Cupid struck the Tyee practically amidships and damaged it considerably, with little damage to the Cupid. Not only do the witnesses disagree as to the place where the collision occurred, but, on behalf of the Tyee, it was testified that the Cupid "hit and ran" and that they had to pursue and overtake her, whereas on behalf of the Cupid it was testified that one vessel tied up to the other and that the matter of fault was discussed between the respective crews. The master and lookout of the Tyee testified that in response to the first question, the teen-age brother of the master of the Cupid declared that he had been steering and that he confused the red light of the Tyee with the red light of the buoy marking the west limit of the channel at that point. On the other hand, the master of the Cupid and his brother testified that the master of the Tyee and his lookout were under the influence of liquor; that they smelled of liquor; that there were two empty bottles of beer on the compass shelf in the pilot house and a whiskey bottle on the galley table of the Tyee; and the brother further testified that he saw the lookout vomiting shortly thereafter.

■■ The conclusion is inescapable that the collision could not have occurred without negligence on the part of each vessel. I am, therefore, inclined to believe that the master and lookout of the Tyee were under the influence of liquor and that a teen-age boy was in charge of the Cupid at the time of the collision. The finding that the boy admitted he was steering and that he confused the red light of the Tyee with the red light of the buoy near where the collision occurred, explains why the Cupid made a corresponding change in her course to the left every time that the Tyee changed her course slightly to the right until the Tyee was compelled to shave the buoy just before the collision. Within an hour or so after the collision the master of the Cupid told the master of the Tyee that he would assume the cost of repairing the Cupid, which must be treated as an admission of fault.

I find that the vessels were in a narrow channel and approaching each other on a collision course for a considerable period of time before the collision; that the Tyee was at fault (1) in not giving a passing signal, (2) in not giving the danger signal when she was in doubt as to the course or intention of the Cupid, (3) in not stopping and reversing in time to avert the collision, and (4) in that the master and lookout were under the influence of liquor. I further find that the Cupid was at fault in the following particulars: (1) She was on the wrong side of the channel, (2) she did not pass port to port although there was ample time in which to do so, (3) she did not give a passing signal, (4) she did not give the danger signal, (5) she did not stop and reverse, (6) she did not have a lookout, and (7) she was not in charge of a competent master at the time of the collision. All of the foregoing faults were violations of Sections 203, 210 and 221, Title 33 U.S.C.A. and contributed to the collision.

The master of the Cupid testified that he gave a starboard passing signal. I find that this is not true not only because they were on a collision course, but because if his testimony as to the situation at that time is true, the law did not require a signal for a starboard passing and, moreover, if as he testified, he received no response and neither vessel had sounded the danger signal, it was gross negligence, without a lookout, to take his eyes off the Tyee for such a length of time that when he again looked, the Tyee was crossing his bow at such close quarters that he did not even have time to close the throttle.

■ From the foregoing, I conclude that both vessels were negligent and that the damages should be divided.

I find that the reasonable cost of repairs of the Tyee was $6218.19. An examination of the damage sustained by the Cupid revealed a split bow stem and the loss of caulking from some of the seams at the stern, apparently from the shock of the collision. These repairs cost $400. But a few days later the vessel was discovered to be sinking. It was then determined that the seams just above the water line at the stern had not been caulked, in consequence of which, when the hull kept settling from the accumulation of water in the bilge from normal leakage, water came through these seams at a relatively rapid rate. The reasonable cost of repairing the damage caused by the submergence of the motor is $672 for labor and $35 for parts. Damages for loss of use for 7 days of $350 is allowed. Because of the urgent need of the vessel in connection with the logging business of the claimant, the repair of other damages attributable to the collision such as damage to the exhaust line and loss of caulking from the seams was postponed to the following year. I find that the cost of repairs to the exhaust line and of recaulking the seams referred to was $400, making a total allowed for repairs of the Cupid $1857.

I conclude, therefore, that the libelant is entitled to recover $2180.60 from the claimant.