COMMERCIAL BARGE LINES, Inc., as Owner of THE M/V COMMERCIAL CLIPPER, Libelant,

v.

The AMERICAN BARGE LINE COMPANY, Owner of THE Towing Steamer TENARU RIVER, Respondent.

No. 35.

United States District Court
W. D. Kentucky, at Louisville.

Aug. 31, 1955.

John Paul Jones, Memphis, Tenn., Wrape & Hernly, Memphis, Tenn., Louis H. Jull, Louisville, Ky., of counsel, for libelant.

Charles F. Wood, Peter, Heyburn & Marshall, Louisville, Ky., for respondent.

SHELBOURNE, Chief Judge.

The libel in this proceeding in admiralty was filed January 17, 1955 by Commercial Barge Lines, Inc., owner of the motor vessel Commercial Clipper against the towing steamer Tenaru River and in personam against her owner The American Barge Line Company, seeking damages arising out of a collision between the Commercial Clipper and the Tenaru River, which occurred on the Ohio River about opposite Mount Vernon, Indiana, at approximately 9:30 P.M., January 19, 1950.

The happening of the collision, the time thereof, or the resulting damage to the Commercial Clipper are not in dispute, but, as usual in such cases, the location of the collision in the river with respect to the sailing line and the facts and circumstances leading to and causing the collision are in absolute conflict, the Captain of each vessel involved laying the fault at the door of the other.

The testimony of some of the witnesses contains such contradictions as raise a serious question of credibility, but the circumstances surrounding the event and their remoteness in point of time, indicate faulty memory rather than any willing misrepresentation of fact.

The case was tried to the Court May 18, 1955. From the evidence adduced at the trial, the Court makes the following

Findings of Fact

1. On the night of January 19, 1950, at approximately 9:30 P.M. the motor vessel Commercial Clipper (hereinafter referred to as the Clipper was proceeding downstream in charge of Captain Tuttle Lockwood, Jr. The Clipper itself had a cargo of approximately 300 automobiles and was pushing in tow one barge, the CBL 210. This barge was loaded with

approximately 300 automobiles. The Clipper is equipped with three engines, three propellers and two rudders. On this occasion, the starboard engine and propeller on the Clipper could not be operated. This condition made the starboard rudder about twenty-five percent effective.

The Clipper's superstructure extends outward from its hull above the water line about 8 feet and is 170 feet long and 35 feet wide. The CBL 210 is of similar construction to the Clipper and about the same length and width. Hence, the Clipper flotilla had a total length of approximately 300 feet.

2. The Tenaru River is fueled with oil, a twin screw vessel with port and starboard rudders. On the occasion in question, it was pushing a tow of 11 barges, 8 loaded and 3 empty. The barges were arranged in the tow in four tiers, three abreast, the first three tiers and the two barges in the lead, which were described as a "spiked" tow. The lead barges were RTC 120 on the port and ABL 72 on the starboard.

The width of the two barges at the bow of the tow was some 30 feet less than the width of the tiers of three barges between the lead barges and the Tenaru. The Tenaru, with its tow, was about 880 feet long.

Both vessels were equipped with searchlights and radar, which included means of communicating from ship to ship and ship to shore and there is no testimony that the vessels and their respective tows were not equipped with proper lights required by the Marine Rules. Neither vessel had a lookout at the bow of the tow. Each had a Master and Mate on watch, but neither had any on the tow.

3. The river for several miles upstream above Mile 829 is practically straight. At Mile 829, there is a sharp bend and from that point, the river flows in a southwestwardly direction to a point below Mile 830.

On the occasion in question, the river was at flood stage, the reading on the gauge at Evansville, Indiana, being 45.8.

The river between the downstream point at Mt. Vernon Towhead and Mile 828 is about 1,000 feet in width at its narrowest point and 1,500 feet at the widest, the sailing line being approximately halfway between the Kentucky shore and Mt. Vernon Towhead.

The night was clear and the pilots of each vessel sighted the other when they were at least three-fourths of a mile apart. Shortly after the pilots had sighted the other vessel, the up-bound Tenaru River gave a whistle signal to the Clipper for port to port passing, which signal was understood and answered by the Clipper's Master.

Captain Stroube, in charge of the Tenaru River, estimated the speed of his vessel at about six miles per hour over the bottom and Captain Lockwood, of the Clipper, estimated his speed at ten or twelve miles per hour over the bottom.

Captain Stroube testified that the collision occurred when near the Kentucky shore line and far south of the sailing line and at a point at least one third a mile upstream from the point where Captain Lockwood pointed out as the place of the collision.

Captain Lockwood also testified that the collision occurred north of the sailing line and about midway between the sailing line and the downstream tip of Mt. Vernon Towhead.

4. The port corner of the port barge on the bow of the Tenaru River's tow struck the Clipper aft on its port side. The strong current of the river had a tendency to pull the head of the Tenaru's tow toward midstream as it negotiated the sharp turn in the river from about Mile 829, and a wind of some twenty to twenty-five miles per hour blowing out of the northeast had a tendency to blow the Clipper toward the sailing line and as above stated, neither ship had a lookout at the head of the tow. This was a violation of the Inland River Rules. In addition, the Clipper was operating without her starboard engine. This resulted in her operating at approximately sixty percent of her rudder efficiency.

Unquestionably one of the vessels or both were turned at an angle toward the channel, a conclusion which is supported by Captain Stroube's statement that he never saw the Clipper's starboard running light, but at all times the only light visible to him was the Clipper's red, port running light.

Captain Stroube further stated that he misjudged the distance between the head of his tow and the clipper, which he thought was due to the abnormal height of the Clipper's bridge and superstructure above the water, which gave an illusion of distance.

5. It is also concluded that Captain Stroube did not have an accurate idea of the Clipper's position or course. This is bottomed upon his statement that he reversed his engines for four minutes in a futile effort to avoid the collision, but without giving a danger signal.

Captain Lockwood's statement at the Marine hearing, shortly after the collision occurred, in substance that he had been on the wrong side of the river, though denied at the hearing here, shows that he may have crowded the Tenaru River.

It is the finding of the Court that both vessels were in fault.

### Conclusions of Law

I. The Rules of Operation, 33 U.S. C.A. § 203, provided for the passing of the vessels port to port and for the giving of one short and distinct blast of the whistle by the Tenaru River to undertake that character of passing. The rules also provide that when either vessel fails to understand the course or intention of the other from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the whistle.

In the case of Postal S. S. Corporation v. El Isleo, 308 U.S. 378, 60 S.Ct. 332, 336, 84 L.Ed. 335, the Supreme Court said

"The plain purpose of the Inspectors' Rules is to minimize the danger of collision. The so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision and in the presence of that danger both vessels must be stopped and backed if necessary, until signals for passing with safety are made and understood'."

See also Richard J. Barnes v. Republic Transportation Company, Inc., 2 Cir., 111 F.2d 294, which is somewhat similar to the case at bar. There a decree was ordered for the division of the damages between the two vessels; in other words, the Court held in a situation similar to that in this case, that both vessels were at fault.

Judge Hartshorne, in Tide Water Associated Oil Co. v. The Syosset, D.C.N.J., 105 F.Supp. 281, 283 said

"'Nothing is better settled than that, if a steamer be approaching another vessel * * * whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty. * * The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect.'"

Atlas Assurance Co., Ltd. v. The Cupid, D.C.Alaska, 108 F.Supp. 590, involved a collision resulting from the negligence of both vessels and the Court ordered the damages divided. This was also ordered in Old Time Molasses Co. v. United States, 5 Cir., 31 F.2d 963. Also in The Fulton, 2 Cir., 54 F.2d 467, opinion by Judge Learned Hand.

II. It is therefore concluded upon the facts found and the conclusions of law based upon the authorities referred to that each of the vessels involved in this collision was at fault. Principally is this true because neither vessel had a lookout at the head of the

tow. The observance of this requirement of the Rules could have and doubtless would have prevented this collision. When it became apparent to the Master of each vessel that the port to port crossing was not being executed properly, each vessel should have been stopped and backed, with appropriate danger signals given.

An appropriate decree will be presented by Counsel for the respondent, upon notice to Counsel for the libelant.